E-FILED
Friday, 10 July, 2009  04:51:34 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

KIMBERLY WALLIS,                    )
                                    )
            Plaintiff,              )
                                    )
vs.                                 )
                                    )
TOWNSEND VISION, INC., d/b/a        )        No. 06-3227
TOWNSEND ENGINEERING                )
COMPANY, an Iowa Corporation,       )
                                    )
            Defendant.              )

## OPINION

RICHARD MILLS, U.S. District Judge:

This case is before the Court on three motions for partial summary judgment filed by the Plaintiff.

Plaintiff Kimberly Wallis filed this two-count lawsuit against Defendant Townsend Vision, Inc., asserting claims for strict liability in Count I and negligence in Count II. The lawsuit stems from an incident that occurred at Cargill Meat Solutions, Inc., a pork processing facility in Beardstown, Illinois, where Wallis was employed. An assembly-line process was set up whereby a conveyor brought ham butts (which are actually the

shoulders of a hog) to a skinning and "de-fatting" station. There were two Townsend Model 7600 butt skinning machines at the station. Wallis was injured when her left hand was caught and drawn in between the spiked roller and cutting blade of one of the machines. Her injuries included severe damage to her thumb, left hand and loss of her little finger.

## I. BACKGROUND

Kim Wallis is a 31-year old woman who was afflicted with bilateral congenital hearing loss when she was a child. She accepted employment with Cargill Meat Solutions, Inc. in Beardstown in March 2004.

On September 28, 2005, Wallis was one of three butt skinning machine operators who were working on a pork processing line at Cargill. The other operators were Juana Soto and Ismael Rivera. Terry Cagle, the lead man at Cargill, had supervisory control over the pork processing line, though Townsend alleges that Cagle did not see the accident occur and has no personal knowledge of what the specific serial number of the involved machine was.

The plant processed 2440 pork butts per hour. These butts would be

delivered to the person operating the butt skinning machine on a conveyor belt which ran between two machines.  The operator of the appropriate machine took the butts off the line with one hand and put them through the skinning machine with the other hand.

Wallis claims that the undisputed testimony is that on September 28, 2005, she was operating the Townsend 7600 skinning machine to the left of the pork conveyor belt.  Townsend disputes this allegation and claims that Darrell Taber, a Cargill maintenance mechanic, pulled Wallis's glove for her left, non-dominant (injured) hand out of the machine right after the accident.  Taber recalled that he pulled her glove out of the left side of the machine that had the de-fatting blade that curved upward and to the left. This is the machine with the serial number 170.   At the time of the post-accident inspection, this machine was on the right side of the conveyor line. Townsend asserts that this is the same machine that Cargill personnel pointed out to the accident investigators after the accident.  Moreover, Cargill Safety Engineer Ricky Clayton testified that this accident occurred on machine serial number 170.

3

In the fall of 2006, Cargill allowed John Kovalan, a technical consultant for Wallis, and attorneys for the parties, to enter the plant to inspect the machine and processing line where Wallis was working on the day of the accident.  The plant was not in production at the time of this visit.  Kovalan first started to inspect the skinning machine on the left side of the conveyor belt, but a Cargill maintenance employee told Wallis's attorney that Wallis was working on the Townsend machine on the right of the pork conveyor belt at the time she was injured.

The Townsend 7600 skinning machine on the right side of the conveyor belt was identified through discovery as being Townsend Unit 170, which apparently was first sold by Townsend as early as 1994.  The Townsend 7600 skinner, Number 170, located on the right side of the conveyor belt, would never be switched over to operate on the left side of the conveyor belt, according to the deposition testimony of Lincoln Woods, who was Cargill's Plant Operations Manager on September 28, 2005.  Townsend acknowledges that this is what Woods said, though it notes that other witnesses have testified to a lack of knowledge.  Moreover, no Cargill

witnesses, including Woods, have testified to actual knowledge of the specific serial number of the machine involved in Wallis's accident, nor has any witness explained why the parties were directed to inspect (according to Wallis) the "wrong" machine after the accident. Woods was not present at either the accident or the post-accident inspection.

The 7600 skinner on the left side of the conveyor belt was Unit 1815, which was sold and installed in the Cargill plant in October 1998. Townsend alleges that the machine was on the left side of the conveyor at the time of the post-accident inspection, though it is unknown what its location was at the time of the accident. Wallis claims that Terry Cagle, line supervisor Stacey Garcia, and co-worker Juana Soto have testified that the 7600 Townsend skinning machine which was on the left side of the conveyor belt the day of the accident was never used on the right side of the conveyor and remained on the left side of the conveyor until it was replaced by an automated machine some time after the inspection by the attorneys for the parties. In disputing this allegation, Townsend asserts that no one knows the serial number of the machine that was involved in the incident.

## II. ANALYSIS

### A. Summary judgment standard

The entry of summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "Rule 56(c) mandates the entry of judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.

### B. Statute of repose

#### (1)

One of Townsend's affirmative defenses is that Wallis's strict liability claim is barred by the Illinois Statute of Repose.  Wallis seeks the entry of partial summary judgment on that defense and asks the Court to strike it.

The applicability of that defense turns on whether Wallis was injured on machine serial number 170 or machine serial number 1815. As it relates to this case, the Illinois statute of repose precludes strict liability actions that are not commenced within ten years "from the date of the first sale, lease or delivery of possession [of a product] to its initial user, consumer or other non-seller." See 735 ILCS 5/13-213(b).

The machine with serial number 170 would be subject to the statute of repose defense because the injury occurred more than ten years from the date it was first sold in 1994. Because the number 1815 machine was sold and installed in the Cargill Plant in October 1998, that machine would fall outside of the statute of repose defense.

In contending that the accident occurred on number 170, Townsend relies in part on an excerpt of the report of its expert witness, Dan McCausland. The excerpt states, in pertinent part, that "Mr. Darrell Taber, cut floor mechanic working on the day of the accident, identified machine Serial Number 170 as the one on which the accident occurred." Wallis objects to this testimony as hearsay. At his deposition, however, Taber

appears to testify that he was wrong when he identified that machine in March 2008, while observing with the attorneys the machines at a storage location. Taber testified that Wallis was actually working at the other machine.

Townsend also points to the testimony of Rick Clayton, Cargill's regional safety manager, who resided in Pennsylvania at the time of the accident. Clayton was asked at his deposition whether anyone at Cargill could identify which machine was on the left side. Clayton stated, "Yes, we did quite a bit of looking into that to try to figure that out. According to the people at the plant, which include Jim Clark, Kim Cooper, Ron Russell, the plant engineer, they can't specifically state exactly 1815 was on the right or left." After initially saying that those employees think the 170 was on the right side, Clayton clarified by stating that those employees say that the 170 was typically on the left and the 1815 was on the right, though no documents exist which would establish the location of the machines.

(2)

The problem with Clayton's testimony is that he has no personal

8

knowledge of where the machines were located on the day of Wallis's accident. Clayton's assertion that the 170 was typically on the left is based on the hearsay statements of Cargill employees. Wallis notes that Townsend did not take the deposition of Jim Clark or Kim Cooper. Although Wallis has taken the deposition of ten Cargill employees, including Ron Russell, she claims that no employee has ever testified that the 170 was on the left side on September 28, 2005. Because Clayton's testimony as to the positioning of the machines is not based on personal knowledge, it is not helpful in determining that issue.

The record establishes that the Unit 1815 was on left side of the line when it was examined more than two years later. Juana Soto, who was next to Kim Wallis when she was injured, testified that Wallis was working on the left side of the line. Lincoln Woods also testified that Wallis was working on the left side. Additionally, Darrell Taber testified that Wallis was on the left side when she was injured.

Terry Cagle, the supervisor on the pork processing line, testified that the machines would not be moved from one side to the other. Rick Clayton

also testified that it would not be typical to move a machine.  Clayton
stated that "moving that machine would not be an easy task.  So typically
once we set the machines in place in a configuration like this, this is the way
it stays, unless a machine breaks down and has to be replaced."  Moreover,
there were no documents which tended to show that a machine was ever
moved because it had broken down.  Darrell Taber testified that the skinner
on the left side would have always been on that side.  Juana Soto also
testified that the machine on the left was not moved until it was replaced.


The Court notes that there is no dispute that Wallis was working at
the machine on the left side of the pork processing line when she was
injured.  All of the competent evidence shows that Unit 1815 was on the
left side.  That machine was on the left side when it was examined.  There
is no evidence that the Unit 1815 was ever moved and it would have been
unusual to do so.  The evidence presented by Townsend that the Unit 170
was on the left side includes its expert McCausland's report, which relies on
Taber's alleged statement in March 2008 that Wallis was working at the

Unit 170.  However, Taber later corrected himself.   Moreover, Taber's other statements--that he saw the glove in the skinning machine on the left side of the line and that the machine on the left would not have been moved–suggest that the accident occurred on the Unit 1815.

Townsend has failed to present any competent evidence that the Unit 170 was the machine operated by Kim Wallis on the left side of the pork processing line when she was injured.  The record establishes that the Unit 1815 was on the left side of the line upon a later inspection.  There is no evidence that the machine was ever moved before it was retired from service. Moreover, there is substantial evidence that it would have been unusual to move it.  Accordingly, all of the competent evidence shows that Wallis was injured on the Unit 1815.

Because the record shows that the Unit 1815 was shipped by Townsend in October 1998, which was approximately seven years before Wallis's injury, the statute of repose defense does not apply.  The Court will, therefore, ALLOW Wallis's motion for partial summary judgment on Townsend's affirmative defense that her claim is barred by the statute of

repose.

C. Failure to mitigate damages

(1)

In its Answer to Wallis's Amended Complaint, Townsend claims that Wallis failed to mitigate her damages by refusing non-manual labor employment. Mitigation of damages is a recognized defense under Illinois law. See Chicago Title and Trust Co. v. Baskin Clothing Co., 219 Ill. App.3d 726, 737-38 (1st Dist. 1991). An injured plaintiff is required to act reasonably.

> [Mitigation of damages] rest[s] upon the same fundamental policy of making recovery depend upon the plaintiff's proper care for the protection of his own interests . . . and require[s] of him only the standard of the reasonable man under the circumstances.

Clarkson v. Wright, 108 Ill.2d 129, 132 (Ill. 1985). Upon sustaining an injury, therefore, a plaintiff is required to mitigate her damages "in any reasonable way possible." Id. at 133.

Wallis alleges that within a month after the injury, Cargill wanted her to return to work at another job, but Wallis had no idea what the job was.

Townsend asserts that if Wallis had no idea what the job was, it was because she never contacted Cargill to find out about the job and to follow-up on her doctor's advice to return to light duty.  Dr. Michael Beatty saw Wallis on October 6, 2005, approximately six weeks after her injury and surgery.  He described her injury as one of a de-gloving type.  Townsend claims that although injuries may be severe, physicians may yet "release" claimants back to light duty work or to work with appropriate accommodations.

Wallis had additional surgery on or about September 19, 2007, to increase the web space between the thumb and index finger on her left hand.  Based on his examination of her on November 7, 2007, Dr. Beatty rendered his opinion that she was not able to work efficiently enough for someone to hire her for computer-type work.  Townsend claims that this is a disputed issue and notes that Dr. Mark Greene, her surgeon and initial primary treating physician, said that she was able to perform efficiently enough.  Townsend asserts that Dr. Greene released Wallis to work, light duty, just a few days after the accident.  Townsend further asserts that Dr. Beatty testified that Wallis left the care of Dr. Greene because he had tried

13

to return her to work under Cargill's light duty return to work program, and that she disagreed with that advice.

Wallis was referred to a psychiatrist in St. Louis for psychological problems resulting from her injury. Paul Packman, M.D., who has treated Wallis since November 15, 2005, opined in a letter dated May 29, 2007, that due to the severity of Wallis's clinical condition, she was unable as of that date to perform any work.

On November 8, 2006, Wallis consulted with Dr. Elvin Zook, a plastic and reconstructive surgeon in Springfield, Illinois, concerning possible surgery to improve the functioning of her left hand. Dr. Zook's evaluation of the hand revealed the following: amputation of the little finger, injury to the thumb, reduction of fractures, repair of tendons and nerves, revascularization of her thumb and index finger, and a skin graft on her palm. Moreover, Wallis was unable to straighten out her index finger or bring her thumb out to grasp things and had scar constricture that pulled her thumb. In September 2007, Dr. Zook performed additional surgery, after which she still lacked 30 degrees of full extension.

14

Dr. Zook saw Wallis periodically after the surgery, the last time being in January 2008. At that visit, she inquired about looking for a job. He told Wallis that she could, but there were some jobs that she was just going to have to find that she could do given her limitations. Dr. Zook's opinions, within a reasonable degree of medical certainty, are that (1) the condition of Wallis's left hand is permanent; (2) she has an increased chance to have arthritis in her left hand in the future; (3) her complaints of pain when she does a lot of keyboarding are consistent with the injury; (4) she is not malingering or not trying hard to recover. Townsend notes that when he was deposed in September of 2008, Dr. Zook testified that Wallis by then was able to engage in gainful employment activity.

Wallis contends that Townsend has failed to produce any evidence as to what type of job was offered by Cargill, the work location for the job, or any description of the work required. The uncontradicted medical testimony in this case is that Wallis was not physically or psychologically able to return to work from the time of the injury until after May 29, 2007. Wallis asserts, moreover, that there is no evidence that Cargill offered her

any type of employment since that date.

(2)

In the "Argument" section of its brief, Townsend does not point to much specific evidence concerning her alleged failure to mitigate. Townsend simply cites the applicable law and makes general statements about the role of the jury and that of the Court. In the "Additional Material Facts" portion of its brief, Townsend asserts that Dr. Greene released Kim Wallis back to work a few days after the accident. Townsend cites Exhibit A[1], which consists of four pages, alleged to support its assertion. The first page, dated 12/20/05, includes the statement that following Wallis's initial hospitalization, "she apparently was discharged and then was given a slip for return to work one-handed," but failed to report. As Wallis alleges, the source of page one is not apparent, though it appears to have been produced by her in discovery. The document also includes the following notation: "Spfld Clinic – Dr. Brown008."

The second page of Exhibit A is in different type than the other three

---

[1]The Court previously denied Wallis's motion to strike Exhibit A.

16

and is identified as page 3 of 8. This page appears to discuss Wallis's alleged refusal to seek employment. The origin of the document is not entirely clear, though it also appears to have been produced by Wallis in discovery. It also looks like it was produced in Wallis's lawsuit against Cargill.

The third page of Exhibit A appears to be page 3 of a 5-page report dated 10/27/05 with the name of Robert L. Gordon, M.D., Midwest Occupational Health Associates, at the bottom of the page. The page states that on October 5, 2005, Dr. Green released Wallis back to work on one-handed duty at Cargill.

The fourth page of Exhibit A is dated November 8, 2006. The heading is "SIU Physicians & Surgeons Clinic Note" and the name of Michael W. Neumeister, M.D., is listed at the bottom. The Note states in part, "She was released to return light work as of October 5, 2005; apparently according to the notes here, the patient was not happy with the return to light duty and therefore sought attention with Dr. Beaty. The patient has been off work since the time of the surgery."

At his deposition, however, Dr. Beatty did testify that he understood that Wallis left the care of Dr. Green because Dr. Green had approved her for light duty work soon after the injury.  Dr. Beatty, who examined Wallis in the months following the incident in 2005, suggested that Wallis could do some type of work within several months of the injury.  In January 2008, Dr. Zook also testified that there were certain jobs that Wallis could not perform.  Thus, she would have to find one that she could do based on her limitations.

The Court concludes that although there is a genuine issue of material fact regarding whether Wallis was physically able to return to work, the only competent evidence produced is that Wallis was not psychologically prepared to return to work in late 2005, according to Dr. Beatty.  Moreover, Dr. Packman opined that Wallis was not psychologically ready to return to work as of May 29, 2007.  Townsend has not presented any admissible evidence which creates a genuine issue of material fact regarding whether Wallis was psychologically prepared to return to work.[2]  Thus, Townsend

---

[2]In a previous Order, the Court granted the Plaintiff's motion to strike three exhibits.  These included two unsupported reports of Dr. Wayne Stillings, a

is unable to create a factual dispute regarding whether it would have been reasonable for Wallis to return to work. Accordingly, the Court must ALLOW the Plaintiff's motion for summary judgment as to Townsend's affirmative defense of mitigation of damages.

### D. Assumption of risk

Wallis has moved for summary judgment on Townsend's fourth affirmative defense. Townsend asserts that, in admittedly and knowingly violating her employer's work rule and not paying attention to her job when she was operating the skinner, Wallis assumed the risk under Illinois law. Wallis contends that Townsend's argument that she assumed the risk of injury because she was inattentive is not the law in Illinois. Moreover, Wallis claims that Townsend has not provided any admissible evidence that Cargill had such a work rule, though she admits she was told to pay attention to what she was doing.

The parties agree on the following material facts: The roller teeth on the Townsend 7600 skinning machine assist the operator by rotating and

psychiatrist, and Dr. Stillings's deposition testimony in another case involving Wallis.

19

pulling the butt through the machine.  On the morning of September 28, 2005, Wallis's co-worker Juana Soto became upset because Ismael Rivera would not rotate with her.  Wallis looked for the Floor Supervisor, Stacey Garcia, and waived to her.  Garcia came over and Wallis told her that Rivera refused to rotate.  Garcia gestured to Wallis indicating that she would talk to him.  Wallis went back to work.  Garcia went behind her and to her left to talk to Rivera.  Wallis was distracted and looked over to see what was happening.  At that point, the machine took her hand.

"[A]ssumption of risk is an affirmative defense interposed against a plaintiff who voluntarily exposes himself to a specific, known risk, not a preclusion of recovery against a plaintiff whose occupation inherently involves general risks of injury."  Court v. Grzelinski, 72 Ill.2d 141, 149 (1978).  The determination of whether an individual has assumed the risk involves a subjective test–it is that person's "knowledge, understanding and appreciation of the danger which must be assessed, rather than that of a reasonably prudent person."  Williams v. Brown Mfg. Co., 45 Ill.2d 418, 430 (1970).  The Appellate Court of Illinois has stated:

20

> Whether the character of plaintiff's conduct is such that he may be deemed to have voluntarily and unreasonably encountered a known risk must necessarily depend upon the particular circumstances of each case.  In situations where the nature of plaintiff's employment requires exposure to certain hazards, it would be a Non sequitur of the policy considerations of strict tort liability to say that plaintiff has voluntarily and unreasonably assumed such hazards by the mere acceptance of his employment.  There must, we think, be an element of conscious conduct resulting in the injury which is not satisfied by mere inadvertence or momentary inattention.

Scott v. Dreis & Krump Manufacturing Co., 26 Ill. App.3d 971, 990 (1st Dist. 1975).

Townsend's argument in favor of an instruction is based on Wallis's knowing violation of her employer's work rule in failing to pay attention to her job.  "All that is required to justify the giving of an instruction is that there be some evidence in the record to justify the theory of the instruction."  Leonardi v. Loyola University of Chicago, 168 Ill.2d 83, 101 (1995).  Wallis notes that under Illinois law, a defendant must establish that the plaintiff had knowledge of the condition which made the machine dangerous; the plaintiff understood and appreciated the risk of injury from the condition and proceeded to use the machine; the condition was a

21

proximate cause of the injury.  "However, the plaintiff's inattentive or ignorant failure to discover or guard against the unreasonably dangerous condition of the [Townsend 7600 Series Skinner, Unit 1815] does not constitute assumption of risk."  See I.P.I. B 400.02.01 (2000).

Based on the foregoing, it is apparent that something more than failing to pay attention is necessary in order for the affirmative defense of assumption of risk to apply.  The "rule" to pay attention is so general that it would seem to apply to almost any job in the work force, though it no doubt is particularly critical to be attentive if the job requires working with dangerous machines like the skinning machines at Cargill.  Nevertheless, the Court concludes that an assumption of risk instruction is not warranted if the record establishes only that an individual's attention was momentarily diverted while working with dangerous equipment.  Some sort of conscious conduct is required.  For example, in certain instances, a person might assume the risk by not wearing safety equipment when operating certain equipment.  See Calderon v. Echo, Inc., 244 Ill. App.3d 1085, 1092-93 (1993) (concluding that there was sufficient evidence of assumption of risk

when plaintiff did not wear safety glasses while using a trimmer, despite his knowledge of the potential risks).

For the reasons noted above, the Court holds as a matter of law that Wallis's momentary failure to pay attention while operating the skinning machines is not enough to establish an assumption of risk. Unless there is some other evidence that Wallis assumed the risk, the Court will decline to instruct the jury on that affirmative defense.[3] Accordingly, the Court will ALLOW the Plaintiff's motion, to the extent that Wallis seeks to prevent Townsend from arguing that any momentary inattentiveness while she worked constituted an assumption of risk.

<u>Ergo</u>, the Plaintiff's motion for partial summary judgment on the Defendant's second affirmative defense, that Plaintiff's claims are barred by the Illinois Statute of Repose, [d/e 39] is ALLOWED.

The Plaintiff's motion for partial summary judgment on the Defendant's third affirmative defense, that Plaintiff failed to mitigate her damages, [d/e 40] is ALLOWED.

---

[3]The Court recognizes that evidence could be presented at trial which might warrant such an instruction on assumption of risk.

23

The Plaintiff's motion for partial summary judgment on the Defendant's fourth affirmative defense, assumption of risk, [d/e 41] is ALLOWED, to the extent provided in this Order.

ENTER: July 10, 2009

FOR THE COURT:

s/Richard Mills
United States District Judge

24